# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DAVID SCHLESSINGER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| THE CHICAGO HOUSING AUTHORITY, ) | |
| CVR ASSOCIATES, INC., CHARLES ) | Case No. 12 C 3733 |
| WOODYARD (in his individual capacity), ) | |
| ANA VARGAS (in her individual capacity), ) | |
| JESSICA PORTER (in her individual ) | |
| capacity), and KEN LOVE (in his ) | |
| individual capacity), ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff David Schlessinger has brought a four-count Amended Complaint against Defendants the Chicago Housing Authority ("the CHA"), CVR Associates, Inc. ("CVR"), and individual employees and officers of the CHA and CVR Charles Woodyard, Ana Vargas, Ken Love, and Jessica Porter (collectively, "Defendants"). In Counts I and II, Schlessinger alleges, pursuant to 42 U.S.C. § 1983, that Defendants retaliated against him for opposing Defendants' improper conduct, in violation of his First Amendment rights. He also asserts supplemental state-law claims of conversion (Count III) and breach of contract (Count IV). Now before the court is Defendants' motion to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the court grants the motion in part and denies it in part. Count I is dismissed with prejudice as to CVR, Woodyard, and Ayala, and without prejudice as to the CHA. The motion to dismiss Count I is denied as to Porter and Love. Count II is

dismissed with prejudice as to CVR and without prejudice as to the CHA. Count III is dismissed with prejudice as to all Defendants. Count IV is dismissed with prejudice as to CVR and the individual Defendants. The motion to dismiss Count IV is denied as to the CHA.

**I. BACKGROUND**

Schlessinger's original complaint, filed May 15, 2012, alleged a number of civil-rights and state-law claims. On November 13, 2012, the court dismissed the civil-rights claims and declined to exercise supplemental jurisdiction over the state-law claims. Schlessinger's First Amendment claims were dismissed without prejudice, and he filed an Amended Complaint on December 10, 2012, repleading those claims, along with two supplemental state-law claims. Defendants moved to dismiss the Amended Complaint on December 29, 2012.[1]

The court takes Schlessinger's allegations as true for purposes of the motion to dismiss. According to the Amended Complaint, Schlessinger is a landlord who has participated since 2005 in the Housing Choice Voucher ("HCV") program, the federal government's Section 8 program providing assistance to renters in the private market. Under the HCV program, once a program participant has located an approved rental unit, a local public housing agency, such as the CHA, pays the landlord a rent subsidy. The agency must inspect the rental unit in accordance with the agency's guidelines, federal regulations, and local law. Schlessinger owns and operates several rental units leased to HCV program participants. He entered into a housing assistance payment ("HAP") contract with the CHA for each of the units. Pursuant to the contracts, the CHA pays Schlessinger a portion of monthly rent on behalf of his tenants.

CVR is a company contracted by the CHA to inspect units as part of the HCV program. Defendant Ana Vargas is CEO of CVR. Defendant Charles Woodyard is CEO of the CHA.

---

[1] Defendants devote part of their motion to dismiss to procedural and substantive due-process claims, but the court gave Schlessinger leave to replead only his First Amendment claims. (*See* Order Nov. 13, 2012 15, 17, ECF No. 25.) The court construes the Amended Complaint as asserting only those federal claims.

Defendant Jessica Porter is Senior Vice President of the HCV Program for the CHA. Defendant Ken Love is Deputy Director of Inspections for the CHA.

In his Amended Complaint, Schlessinger alleges that between March and June 2011, he attended a CHA Public Hearing to voice complaints against the CHA to the public and to the CHA Board of Commissioners ("the Board"). He criticized the CHA for breaching its agreements with United States Department of Housing and Urban Development ("HUD") by knowingly hiring CVR's unqualified and improperly trained inspectors, who lacked required licensing and education. On July 27, 2011, Schlessinger contacted the Assistant to the Director of Public Housing of HUD, Zill Khan, to file a complaint against the CHA. On August 10, 2011, Schlessinger had a teleconference with Porter and Love, during which he discussed his complaints to the Board and to HUD.

Schlessinger alleges that the CHA began to retaliate against him the same day he spoke to Porter and Love. On August 10, 2011, the CHA reclassified an inspection of one of his units to a "fail." This was the first time an inspection of one his units had been reclassified. Schlessinger contacted Love and Salvatore Aiello to inquire as to why the inspection had been reclassified.

On August 16, 2011, Schlessinger contacted Khan at HUD to follow up on his previous complaint. He also had a teleconference that day with Porter, Vargas, and Love. He complained of the same issues he had raised previously before the Board, to HUD, and to Porter and Love. He stated that he felt that the CHA was retaliating against him because of his complaints. Porter told Schlessinger that the CHA would reinspect the unit that had been reclassified to a "fail."

A new inspection of the unit was conducted on August 17, 2011. This time, the inspectors failed fifty items in the unit. This was the largest number of deficiencies for which Schlessinger had ever been cited in an inspection. Schlessinger contacted Love to inquire about

3

the list of failed items, and he was told that the inspection was a "special inspection." According to Schlessinger, a "special inspection" of the unit was not allowed under the CHA's Administrative Plan because neither Schlessinger nor the tenant had requested such an inspection. The CHA did not provide Schlessinger with a timely report regarding the failed items so that he could correct any deficiencies. Schlessinger received a copy of the inspection report on August 29, 2011. The report indicated that the failed items were emergency repairs, but Schlessinger contends that they did not meet the CHA's criteria for emergency repairs.

On August 24, 2011, the CHA received a Notice to Vacate from one of Schlessinger's tenants. The CHA did not provide the notice to Schlessinger until October 28, 2011. The CHA admitted that the untimely notice was a violation of its own policies and procedures. The CHA issued the tenant a voucher permitting her to move from Schlessinger's unit, even though she was still under a lease and had damaged Schlessinger's property.

On August 31, 2011, Schlessinger received a letter from Porter stating that she had determined that there were concerns as to whether he was meeting his obligations under the HCV program and the HAP contracts. She threatened to abate his rent payments and terminate his HAP contracts.

On September 1, 2011, Schlessinger's HAP payment for August 2011 was deficient by $7,800.00. The payment was accompanied by no explanation regarding the deficiency. Schlessinger contacted Love to inquire as to why his payment was deficient. He received an email from Love stating that one of his HAP contracts had been terminated by the CHA. Schlessinger alleges that the CHA failed to tender HAP payments due to him. On October 6, 2011, the CHA sent five of Schlessinger's tenants notices that the CHA intended to terminate them from the HCV program.

4

On January 27, 2012, Schlessinger again complained to the CHA that its inspectors were not properly licensed. On January 31, 2012, the CHA terminated one of Schlessinger's tenants from the HCV program, without providing her with an administrative hearing, and terminated rent subsidy payments to Schlessinger on her behalf. Another of Schlessinger's tenants was terminated from the HCV program without a hearing on February 29, 2012. On April 12, 2012, the CHA inspected one of Schlessinger's properties and cited him with a list of failed items that Schlessinger contends did not constitute failed conditions. Schlessinger alleges that he has incurred damages in the form of lost rental subsidies and continues to incur losses each month for units for which he is not receiving subsidy payments from the CHA.

In Counts I and II of the Amended Complaint, Schlessinger alleges, pursuant to 42 U.S.C. § 1983, that all of the Defendants violated his rights under the First and Fourteenth Amendments by

> adopting, permitting, encouraging, tolerating, ratifying or being deliberately indifferent to a pattern, practice, and policy pursuant to which Defendants unlawfully and improperly contract with private companies to inspect HCV units with personnel who are uncertified, unlicensed, and unqualified to perform inspection under State law and terminate HCV landlords from the HCV program who oppose and complain about the use of the unqualified and uncertified inspectors by citing the landlord for repair needs that do not exist as a pretext for termination from the program and/or the improper conversion of funds through subsidy abatements

(Am. Compl. ¶ 42, ECF No. 27.) Schlessinger further alleges that Defendants eliminated landlords from the HCV program by "contriving breaches of program obligations . . . as a pretext to terminate the landlord['s] HAP contract in retaliation." (Am. Compl. ¶ 43.) In Count II, Schlessinger alleges that the CHA and CVR are liable for the wrongful conduct of the individual Defendants because the Defendants were policymakers who implemented a "long-standing policy, practice, and custom of unlawfully and improperly contracting with private companies to

inspect HCV units with personnel who are unlicensed, uncertified, and/or unqualified to perform such inspections under State law," and also "terminate[d] HCV landlords from the HCV program who oppose[d] and complain[ed] about the use of the unlicensed, uncertified and/or unqualified inspectors." (*Id.* at ¶ 43.) According to the complaint, the CHA and CVR also failed to properly discipline and supervise their officials.

Counts III and IV are supplemental Illinois state law claims. In Count III, Schlessinger alleges conversion. Count IV alleges breach of contract, based on the CHA's unlawful termination of Schlessinger's contracts and the abatement of his HAP payments.

Schlessinger seeks a declaratory judgment that Defendants violated his First Amendment rights and Illinois state law, as well as an injunction barring unqualified and/or unlicensed inspectors from performing inspections in the future. He asks the court to require the CHA "to establish effective policies, procedures, and programs with respect to the training, supervision, and discipline of employees and/or agents of the CHA designed to remedy the conduct complained of herein." (*Id.* at ¶ 70(c)). He also seeks damages for the alleged constitutional violations and for his state-law breach of contract and conversion claims.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss should be granted if the plaintiff fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations in a complaint must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough

details about the subject-matter of the case to present a story that holds together."). For purposes of a motion to dismiss, the court takes all facts alleged in the complaint as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

## III. ANALYSIS

### A. First Amendment Claims (Counts I & II)

Section 1983 provides a cause of action against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Citing the First and Fourteenth Amendments, Schlessinger contends that Defendants retaliated against him for complaints he made about the operations of the CHA and CVR.

1. Protected Activity

To state a valid First Amendment retaliation claim, a plaintiff must allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) a causal connection [exists] between the two." *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010) (citation and internal quotations omitted). Defendants argue that Schlessinger has failed to satisfy the first element, because his complaints to the CHA and to HUD were not protected by the First Amendment, as they were not directed at matters of public concern.

As this court explained in its November 13, 2012, opinion, to determine if speech is protected, courts generally apply the test announced by the Supreme Court in *Connick v. Myers*,

7

461 U.S. 138 (1983), which requires that the asserted speech touch upon a matter of public concern. Whether speech addresses a matter of public concern is determined by the content, form, and context of a given statement. *See id.* at 147-48; *see also Landstrom v. Ill. Dept. of Children and Family Servs.*, 892 F.2d 670, 679 (7th Cir. 1990) (dismissing case by parents who complained privately and directly to school district employees about district's examinations of their children because complaints were "purely personal"). Thus, if Schlessinger's alleged speech involved purely private matters, was designed to further his private interests, was not widely disseminated, or would not matter to the public's evaluation of the CHA's performance, it would not involve a matter of public concern.

Schlessinger alleges that, before the public and the Board, he criticized the CHA for breaching its agreements with HUD by using CVR's unqualified and improperly trained inspectors, criticized the inspections by the CHA of HCV units, and voiced the opinion that the CHA was committing public waste and violating HUD regulations. Accepting these allegations as true and drawing all inferences in Schlessinger's favor for purposes of the motion to dismiss, the court concludes that the alleged communications could constitute protected speech, because they were made publically and could affect the public's evaluation of the CHA's performance.

The court further concludes that Schlessinger has satisfied the second and third elements of a First Amendment retaliation claim, because he alleges deprivations—failed inspections and termination of his HAP payments—sufficient to deter First Amendment activity in the future, and because a causal connection can be inferred from the close proximity in time between his complaints and the alleged retaliation. Defendants argue that Schlessinger's complaints were motivated solely by his private interests in his own contracts and thus were not directed at matters of public concern. But that argument requires the court to evaluate the parties' evidence

8

as to motive and is thus better suited for a motion for summary judgment. At this stage of the proceedings, Schlessinger need only plead facts that establish a claim plausible on its face.

2. *Monell* liability

Because the CHA is a municipal entity, it can be held liable under § 1983 only if the alleged constitutional violation resulted from the execution of one of its policies. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). This may be established by alleging: (1) an express policy that caused the constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled that it constitutes a policy; or (3) that the constitutional injury was caused by a person with final policy-making authority. *See Lewis v. City of Chi.*, 496 F.3d 645, 656 (7th Cir. 2007).

Schlessinger attempts to assert all three types of *Monell* claim in a hodge-podge of allegations. He alleges that the CHA had a

> long-standing policy, practice, and custom of unlawfully and improperly contracting with private companies to inspect HCV units with personnel who are unlicensed, uncertified, and/or unqualified to perform such inspections under State law and terminate HCV landlords from the HCV program who oppose and complain about the use of the unlicensed, uncertified and/or unqualified inspectors; by citing the landlord for repair needs that do not exist as a pretext for termination from the program; by unlawfully and improperly citing HCV landlord for deficiencies that are the sole responsibility of the tenants; and/or the improper conversion of funds through subsidy abatements

(Am. Compl. ¶ 49.) He further alleges that the CHA and its policymakers have "failed to adequately discipline, train, or otherwise direct its officials concerning the rights of HCV landlords," (*id.* at ¶ 50), "failed to properly sanction or discipline its officials," (*id.* at ¶ 51), and have other unlawful policies, practices and customs, (*id.* at ¶ 53-54). Finally, he alleges that "Defendants CHA and CVR are liable for the wrongful conduct of the individually named Defendants as the policymakers were permitted to continue and condone a long-standing policy,

9

practice, and custom" of using unqualified inspectors and terminating and otherwise penalizing landlords from the HCV program who complained about that practice. (*Id.* at ¶ 49.)

Much of this language is boilerplate and therefore insufficient to allege a municipal policy. *See McTigue v. City of Chi.*, 60 F.3d 381, 382-83 (7th Cir. 1995) ("Boilerplate allegations of a municipal policy, entirely lacking in any factual support that a (municipal) policy does exist, are insufficient."). The court therefore disregards Schlessinger's generic allegations of a "long-standing policy, practice, and custom." (*Id.* at ¶ 49.) Additionally, to the extent that Schlessinger alleges a failure by the CHA to train or supervise its officials, he does not meet the Seventh's Circuit's requirements that he allege either (1) a failure to provide adequate training in light of foreseeable consequences, or (2) a failure to act in response to repeated complaints of constitutional violations by officers. *See Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006). The allegation that CHA officials contracted with unqualified housing inspectors and then retaliated against landlords who complained about that practice is not a predictable consequence of inadequate training, and Schlessinger does not allege that anyone but himself complained about the alleged practice of retaliation.

To the extent that the allegations do include factual support, the facts alleged are highly specific to Schlessinger and cannot plausibly support the inference of a widespread, permanent, and well-settled policy on the part of the CHA. The complaint does not support the inference that anyone but Schlessinger complained about the qualifications of the housing inspectors and suffered retaliation as a result. Isolated incidents are insufficient to establish municipal liability. *See Jackson v. Marion Cnty.*, 66 F.3d 151, 152 (7th Cir. 1995); *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1216, 1326 (7th Cir. 1993) ("A single isolated incident of wrongdoing by

a nonpolicymaker is generally insufficient to establish municipal acquiescence in unconstitutional conduct.").

As to the allegations that the violation was caused by someone with policy-making authority, the question is whether the complaint distinguishes acts of policy-makers from acts of other non-policymaking employees of the CHA. *See id*. The CHA cannot be held vicariously liable under § 1983 for the wrongful acts of its employees unless they were capable of establishing official policy—i.e., acting for the municipality—within the meaning of *Monell*. Liability under § 1983 only attaches where 'a deliberate choice to follow a course of action is made . . . by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

Schlessinger has not alleged in Count II that any of the individual Defendants was a final policymaker responsible for the retaliation he allegedly suffered. *See id*. at 481 ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."). The complaint alleges that "Defendants CHA and CVR are liable for the wrongful conduct of the individually named Defendants as the policymakers," but it does not indicate which Defendants took actions that can be considered final policymaking decisions on behalf of the CHA. The court concludes that the complaint has not put the Defendants sufficiently on notice of the claims against them. But the court cannot conclude that it is impossible for Schlessinger to plead allegations sufficient to survive a motion to dismiss.[2] The *Monell* claims

---

[2] Porter is Senior Vice President of the HCV Program for the CHA. Love is Deputy Director of Inspections for the CHA. It is plausible that these individuals exercised final policymaking authority for the City "in a particular area, or on a particular issue." *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 785 (1997). As this court stated in *Nevel v. City of Burbank*, "[a] motion to dismiss generally is not the proper stage to determine whether defendants actually

against the CHA in Counts I and II of the complaint are therefore dismissed without prejudice. Schlessinger may replead his allegations that the allegedly retaliatory actions taken against him were taken by someone with final policymaking authority for the CHA.

      3. <u>First Amendment Claims against CVR and the Individual Defendants</u>

Schlessinger names CVR as a defendant in Counts I & II, but he does not allege that CVR committed any retaliatory actions against him. According to the complaint, CVR "is a company contracted by CHA to perform inspections of Section 8 units and inspection related support services since January 1, 2011." (Am. Compl. ¶ 6.) Schlessinger also alleges that CVR's employees were unqualified and improperly trained. (*Id.* at ¶ 13.) Schlessinger alleges that Vargas is CEO of CVR, but her name appears elsewhere in the complaint only in an allegation that she was part of an August 16, 2011, teleconference. (*Id.* at ¶ 20.) This does not support an inference that Vargas exercised any policymaking authority with respect to actions taken against Schlessinger. Taken together, these allegations do not support a § 1983 claim against CVR, and Counts I & II against CVR are therefore dismissed.

The court next turns to Schlessinger's claims against the individual Defendants, sued in their individual capacities. In Count I, Schlessinger has sued the individual defendants for First Amendment retaliation. Defendants argue that Schlessinger fails to allege that each individual defendant violated his constitutional rights. Liability under § 1983 does not attach to individuals unless the "individual defendant caused or participated in a constitutional deprivation." *Vance v. Peteres*, 97 F.3d 987, 991 (7th Cir. 1996). In order for an individual to be liable under § 1983, "a plaintiff must show the actor was 'personally responsible for the constitutional deprivation.'"

---

have such policymaking authority." No. 01 C 6403, 2003 WL 1606087, at *5 (N.D. Ill. Mar. 27, 2003) (citing *McCormick v. City of Chi.*, 230 F.3d 319, 325 (7th Cir. 2000)).

*J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) (quoting *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002)).

The court first concludes that the complaint fails to state a claim against Woodyard. According to the complaint, Woodyard is the CEO of the CHA and "is responsible to see that [the] CHA [and] its employees and other agents, comply with federal, state and local laws and regulations." (Am. Compl. ¶ 7.) Woodyard is not mentioned elsewhere in the complaint. It is not clear from these allegations what Woodyard allegedly did to deprive Schlessinger of his constitutional rights, or how he could have been personally responsible for the alleged violation. Count I is therefore dismissed as against Woodyard.

Nor does the complaint state a claim against Vargas. As discussed above, Schlessinger alleges that Vargas is CEO of CVR, and that she was part of an August 16, 2011, teleconference. These allegations do not support an inference that Vargas retaliated against Schlessinger in violation of his First Amendment rights. Count I is therefore dismissed as against Vargas.

Porter, according to the complaint, is the Senior Vice President of the HCV program for the CHA and "is responsible to see that [the] CHA [and] its employees and other agents, comply with federal, state and local laws and regulations." (*Id*. ¶ 8.) She participated in a phone call with Schlessinger on August 10, 2011, in which he discussed his complaints and asked her to investigate them. (*Id*. ¶ 15.) The alleged retaliation against Schlessinger began that same day. (*Id*. ¶ 16.) Porter also participated in an August 16, 2011, teleconference with Schlessinger. (*Id*. ¶ 20.) She informed Schlessinger that the CHA would reinspect his unit. (*Id*. ¶ 21.) She wrote Schlessinger a letter dated August 26, 2011, stating that she had investigated his complaint and determined that there were concerns about whether he was meeting his obligations under the HCV program and the HAP contracts. She threatened to abate his rents, terminate his HAP

contracts, and prevent his future participation in the HCV program. (*Id.* ¶ 28.) These allegations support a reasonable inference that Porter knew about Schlessinger's complaints and was personally involved in retaliation against Schlessinger. The motion to dismiss Count I is therefore denied as to Porter.

    The complaint alleges that Love is the CHA's Deputy Director of Inspections and "is responsible for ensuring that [the] CHA [and] its employees and other agents, comply with federal, state and local laws and regulations." (*Id.* ¶ 10.) Love participated in the phone call with Porter and Schlessinger on August 10, 2011, in which Schlessinger discussed his complaints. (*Id.* ¶ 15.) On August 15, 2011, Schlessinger contacted Love and Salvatore Aiello to inquire as to why the CHA changed a previous inspection of one of his properties from a pass to a fail. (*Id.* ¶ 18.) Love also participated in an August 16, 2011, teleconference with Schlessinger. (*Id.* ¶ 20.) Schlessinger contacted Love to inquire about the list of failed items in his unit and was informed by Love that the inspection was a "special inspection." (*Id.* ¶ 24.) Schlessinger asked Love provide him with a copy of the list of failed items so that he could correct any deficiencies, but Love refused. Schlessinger called and emailed the CHA and Love, but the CHA refused to provide him with a timely report regarding the inspection. (*Id.* ¶ 25.) On August 29, 2011, Love finally provided the Plaintiff with an internal copy of the failed special inspection report. (*Id.* ¶ 27.) On September 1, 2011, after contacting Love to inquire as to why his HAP payment was deficient, Schlessinger received an email from Love stating that his HAP contract had been terminated by the CHA and that the CHA was penalizing him by deducting the funds that were paid to him beginning in April 2011 through the present. (*Id.* ¶ 30.) These allegations are sufficient to support a reasonable inference that Love, as Deputy Director of Inspections, personally participated in the reclassification of Schlessinger's unit to a fail and the

14

termination of Schlessinger's HAP contract. The court therefore denies Defendants' motion to dismiss Count I as to Love.

**B. State Law Claims (Counts III and IV)**

Counts and III and IV are supplemental state-law claims. In Count III, Schlessinger claims that Defendants committed conversion under Illinois law. Count IV alleges that Defendants breached the terms of the HAP agreements by terminating Schlessinger's HAP contracts and abating his rent payments, when his properties were in compliance with federal, state and local regulations.

The court first dismisses Counts III and IV as against CVR and the individual Defendants. The complaint alleges that the "*CHA* entered into a Housing Assistance Payment agreement" with Schlessinger. (Am. Compl. ¶ 61 (emphasis added).) Neither CVR nor any of the individual Defendants was a party to the HAP contracts between Schlessinger and the CHA. Nor do the allegations support an inference that CVR or the individual Defendants converted Schlessinger's property. Schlessinger specifically alleges that the CHA unlawfully converted his HAP payments instead of tendering them to him. (*Id*. at ¶ 30.) There is no basis upon which to infer that the other Defendants committed the alleged conversion.

Turning to the state-law claims against the CHA, the court first dismisses the conversion claim in Count III. Schlessinger has failed to plead the required elements of a conversion claim under Illinois law. Those elements are that (1) the plaintiff has a right to the property; (2) the plaintiff has an absolute and unconditional right to the immediate possession of the property; (3) the plaintiff made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. *Loman v. Freeman*, 890 N.E.2d 446, 461 (Ill. 2008). The subject of a conversion claim must be identifiable property.

"Money may be the subject of conversion, but it must be capable of being described as a specific chattel . . . . [A]n action for the conversion of funds may not be maintained to satisfy a mere obligation to pay money." *In re Thebus*, 483 N.E.2d 1258, 1260 (Ill. 1985). Here, Schlessinger has failed to state a claim for conversion because the complaint does not identify specific money that has allegedly been converted. Nor does Schlessinger allege that the specifically-identifiable money in question belonged to him at all times. Rather, the conversion claim is nothing more than a restatement of the breach-of-contract claim in Count IV that the CHA failed to make rent payments due to Schlessinger under the HAP contracts. Count III is dismissed with prejudice.

As to Count IV, Defendants argue that the Local Government and Governmental Employees' Tort Immunity Act, 745 Ill. Comp. Stat. 10/1-101 *et seq.* (the "Tort Immunity Act"), bars claims based on negligent property inspections, imposes a one-year statute-of limitations, and bars claims for punitive damages against local public entities. But the Tort Immunity Act states in section 10/2-101(a) that "nothing in this Act affects the liability, if any, of a local public entity or public employee based on . . . [c]ontract." 745 Ill. Comp. Stat. 10/2-101. Thus, the court concludes that the Tort Immunity Act does not bar Schlessinger's breach-of-contract claim against the CHA in Count IV. "The elements of a breach of contract claim under Illinois law are: (1) the existence of a contract, (2) the performance of its conditions by the plaintiff, (3) a breach by the defendant, and (4) damages as a result of the breach." *Am. Safety Cas. Ins. Co. v. City of Waukegan*, 776 F. Supp. 2d 670, 707 (N.D. Ill. 2011) (citing *Roberts v. Adkins*, 921 N.E.2d 802, 811 (Ill. App. Ct. 2010)). Schlessinger has pleaded each of these elements. According to the Amended Complaint, he entered into HAP contracts with the CHA and complied with federal, state and local regulations regarding the subject properties. The CHA committed a breach of contract by terminating the HAP contracts and abating his rent payments,

causing him damages. The court therefore denies the motion to dismiss Count IV against the CHA.

## IV. Conclusion

For the reasons explained above, Defendants' motion to dismiss is granted in part and denies in part as follows. Count I is dismissed with prejudice as to CVR, Woodyard, and Ayala, and without prejudice as to the CHA. The motion to dismiss Count I is denied as to Porter and Love. Count II is dismissed with prejudice as to CVR and without prejudice as to the CHA. Count III is dismissed with prejudice as to all Defendants. Count IV is dismissed with prejudice as to CVR and the individual Defendants. The motion to dismiss Count IV is denied as to the CHA. If Schlessinger wishes to pursue his § 1983 claims against the CHA, he must file a Second Amended Complaint by July 2, 2013.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: June 3, 2013