UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID SCHLESSINGER, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE CHICAGO HOUSING AUTHORITY, ) <br> JESSICA PORTER (in her individual ) <br> capacity), and KEN LOVE (in his ) <br> individual capacity), ) <br> ) <br> Defendants. ) | Judge Joan B. Gottschall <br><br> Case No. 12 C 3733 |

**MEMORANDUM OPINION & ORDER**

Plaintiff David Schlessinger has brought a three-count Second Amended Complaint against The Chicago Housing Authority ("the CHA") and individual CHA officers Ken Love and Jessica Porter. Schlessinger alleges, pursuant to 42 U.S.C. § 1983, that the defendants retaliated against him for opposing the defendants' improper conduct, in violation of his First and Fourteenth Amendment rights. For these alleged violations, he seeks declaratory and injunctive relief against all of the defendants in Count I and damages against the CHA in Count II. He also asserts a supplemental state-law breach of contract claim against all of the defendants (Count III). Now before the court is the defendants' motion to dismiss the complaint in part pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons explained below, the court dismisses Count III against Porter and Love and strikes Schlessinger's requests for injunctive relief. The motion to dismiss the claims against the CHA is denied.

# I. BACKGROUND

Schlessinger's original complaint alleged a number of civil-rights and state-law claims. On November 13, 2012, the court dismissed the civil-rights claims and declined to exercise supplemental jurisdiction over the state-law claims. Schlessinger's First Amendment retaliation claims were dismissed without prejudice, and he filed an Amended Complaint on December 10, 2012, repleading those claims, along with state-law conversion and breach of contract claims. the defendants moved to dismiss the Amended Complaint on December 29, 2012. The court granted that motion in part on June 3, 2013, dismissing the claims against defendant CVR Associates, Inc. ("CVR") and two individual defendants with prejudice, while denying the motion to dismiss as to individual defendants Porter and Love. The court dismissed Schlessinger's retaliation claim against the CHA without prejudice. The court concluded that Schlessinger had not alleged facts sufficient to show a custom or policy of retaliation on the part of the CHA, pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). But the court gave Schlessinger leave to "replead his allegations that the allegedly retaliatory actions taken against him were taken by someone with final policymaking authority for the CHA." (Mem. Op. & Order June 3, 2013 at 12, ECF No. 45.)

Schlessinger filed a Second Amended Complaint on June 24, 2013. The court takes Schlessinger's allegations as true for purposes of the motion to dismiss. According to the Second Amended Complaint, Schlessinger is a landlord who has participated since 2005 in the Housing Choice Voucher ("HCV") program, the federal government's Section 8 program providing assistance to renters in the private market. Under the HCV program, once a program participant has located an approved rental unit, a local public housing agency, such as the CHA, pays the landlord a rent subsidy. The agency must inspect the rental unit in accordance with the

agency's guidelines, federal regulations, and local law. Schlessinger owns and operates approximately thirteen rental properties housing sixteen families. He entered into a housing assistance payment ("HAP") contract with the CHA for his units. Pursuant to the contracts, the CHA pays a portion of monthly rent on behalf of the tenants.

Defendant Jessica Porter is Senior Vice President of the HCV Program for the CHA. Defendant Ken Love is Deputy Director of Inspections for the CHA. Schlessinger alleges that in May 2009, he attended a meeting of the CHA Board of Commissioners ("the Board") and voiced concerns about the misuse and waste of public funds entrusted to the CHA. Porter approached him after the meeting and told him that she would be his point of contact going forward to address the issues. In early 2011, Porter gave Schlessinger Love's telephone number and advised him that Love was responsible for overseeing the CHA's inspections department, and that Schlessinger should contact Love to resolve any issues with inspections of his units.

Between March and June 2011, Schlessinger attended a CHA public hearing to raise additional complaints against the CHA. He criticized the CHA for breaching its agreements with HUD by knowingly hiring unqualified and improperly trained inspectors from CVR. On July 27, 2011, Schlessinger contacted the Assistant to the Director of Public Housing of HUD, Zill Khan, to file a complaint against the CHA. On August 10, 2011, Schlessinger had a telephone conference with Porter and Love, during which he discussed his complaints to the Board and to HUD. Porter indicated that she would investigate his complaints.

Schlessinger alleges that the CHA began to retaliate against him the same day he spoke to Porter and Love. On August 10, 2011, the CHA reclassified an inspection of one of his units to a "fail." This was the first time an inspection of one his units had been reclassified. Schlessinger contacted Love and Salvatore Aiello to find out why the inspection had been reclassified.

On August 16, 2011, Schlessinger contacted Khan to follow up on his previous complaint. He then participated in a telephone conference that included Porter and Love. He reiterated his previous complaints and stated that he felt that the CHA was retaliating against him because of his complaints. Porter informed Schlessinger that the CHA would reinspect the failed unit.

A re-inspection of the failed unit was conducted on August 17, 2011. This time, the inspectors failed fifty items in the unit. This was the largest number of deficiencies for which Schlessinger had ever been cited in an inspection. Schlessinger contacted Love to inquire about the list of failed items, and Love told him that the inspection was a "special inspection." According to Schlessinger, a "special inspection" of the unit was not allowed under the CHA's Administrative Plan because neither Schlessinger nor the tenant had requested such an inspection. The CHA did not provide Schlessinger with a timely report regarding the failed items so that he could correct the deficiencies. Schlessinger eventually received a copy of the report on August 29, 2011. The report indicated that the failed items were emergency repairs, but Schlessinger contends that they did not meet the CHA's criteria for emergency repairs.

On August 24, 2011, the CHA received a Notice to Vacate from one of Schlessinger's tenants. The CHA did not provide the notice to Schlessinger until October 28, 2011. The CHA admitted that the delay in providing the notice to Schlessinger violated its own policies and procedures. The CHA issued the tenant a voucher permitting her to move from Schlessinger's property, even though she was still under a lease and had damaged Schlessinger's property.

On August 31, 2011, Schlessinger received a letter from Porter stating that she had determined that there were concerns as to whether he was meeting his obligations under the

HCV program and the HAP contracts. She threatened to abate his rent payments and terminate his HAP contracts.

On September 1, 2011, Schlessinger's HAP payment for August 2011 was deficient by $7,800.00. The deficient payment was accompanied by no explanation from the CHA. Schlessinger contacted Love to inquire as to why his payment was deficient. He received an email from Love stating that one of his HAP contracts had been terminated by the CHA and that the CHA was deducting funds paid to him on behalf of the tenant since April 2011. On October 6, 2011, the CHA sent five of Schlessinger's tenants notices that the CHA intended to terminate them from the HCV program.

On January 27, 2012, Schlessinger again complained to the CHA that its inspectors were not properly licensed. He received no response to his complaint. On January 31, 2012, the CHA terminated one of Schlessinger's tenants from the HCV program, without providing her with an administrative hearing, and terminated subsidy payments on her behalf to Schlessinger. Another of his tenants was terminated from the HCV program without a hearing on February 29, 2012. On April 12, 2012, the CHA inspected one of Schlessinger's properties and cited him with a list of failed items that Schlessinger contends did not exist.

Schlessinger alleges that he has incurred damages in the form of lost rental subsidies and that he continues to incur losses each month for units for which he is not receiving subsidy payments from the CHA. In Counts I and II of the Amended Complaint, Schlessinger alleges, pursuant to 42 U.S.C. § 1983, that the defendants violated his First and Fourteenth Amendment rights by:

> adopting, permitting, encouraging, tolerating, ratifying or being deliberately indifferent to a pattern, practice, and policy pursuant to which Defendants unlawfully and improperly contract with private companies to inspect HCV units with personnel who are uncertified, unlicensed, and unqualified to perform

5

> inspection under State law and terminate HCV landlords from the HCV program who oppose and complain about the use of the unqualified and uncertified inspectors by citing the landlord for repair needs that do not exist as a pretext for termination from the program and/or the improper conversion of funds through subsidy abatements

(Second Am. Compl. ¶ 42.) Schlessinger further alleges that the defendants eliminated landlords from the HCV program who opposed the CHA's conduct by improperly inspecting units and "contriving breaches of program obligations . . . as a pretext to terminate the landlord['s] HAP contract in retaliation." (*Id.* at ¶ 43.)

In Count II, Schlessinger alleges that the CHA is liable for the conduct of the individual defendants Porter and Love because

> the policymakers were permitted to continue and condone a long-standing policy, practice and custom of unlawfully and improperly contracting with private companies to inspect HCV units with personnel who are unlicensed, uncertified and/or unqualified to perform such inspections under State law and terminate HCV landlords from the HCV program who oppose and complain about the use of the unlicensed, uncertified and/or unqualified inspectors; by citing the landlord for repair needs that do not exist as a pretext for termination from the program; by unlawfully and improperly citing HCV landlord for deficiencies that are the sole responsibility of the tenants; and/or the improper conversion of funds through subsidy abatements in violation of Plaintiff's First and Fourteenth Amendments rights and State Law claims of conversion and breach of contract.

(*Id.* at ¶ 49.) He further alleges that

> the policymakers were permitted to continue and condone a long-standing policy, practice and custom, and have with intentional and/or deliberate indifference failed to adequately discipline, train or otherwise direct its officials concerning the rights of HCV landlords, thereby causing the individually named Defendants to engage in unlawful and/or wrongful conduct described at length herein.

(*Id.* at ¶ 50.) And he alleges that

> In May 2009, the CHA Board of Commissioners delegated to Defendant Porter authority to oversee and resolve issues complained about by the Plaintiff at the public board meetings. In particular, on August 16, 2011, Defendant Porter called the Plaintiff and informed him that she would be handling his complaints. As a result of her representations to the Plaintiff in 2009 and 2011, and by her acts in

retaliating against the Plaintiff shortly after the August 16, 2011 telephone conference call, Defendant Porter was vested with final policymaking authority.

(*Id.* at ¶ 51.) He also claims that the CHA

> as a matter of affirmative policy by the policymaker Defendant Porter established a policy whereby individuals who exercised their First Amendment rights general and in particular complained about the use of unlicensed, uncertified and/or unqualified inspectors by the policymaker were condoned and that any subsequent investigation or exposure would be covered-up and concealed by the Defendants.

(*Id.* at ¶ 53.) He further alleges that the CHA failed to discipline its officials and had a "policy, practice, or custom" to "financially profit from the unlawful taking of Plaintiff's' abatement payments" (*Id.* at ¶ 56) and "engage in the wrongful expenditures of federal funds" (*Id.* at ¶ 57).

Count III is a supplemental state law claim against all of the defendants. Schlessinger alleges breach of contract, in violation of Illinois law. He alleges that the CHA entered into a HAP agreement with him and "improperly terminated and/or abated subsidies of [his] HCV properties," when the properties were in full compliance with HUD regulations and state and local law. (*Id.* at ¶ 63).

Schlessinger seeks a declaratory judgment that the defendants violated his First Amendment rights and Illinois state law, as well as an injunction barring unqualified and/or unlicensed inspectors from performing inspections in the future. He asks the court to enjoin the CHA or its contractors "from inspecting HCV properties without the proper certification and/or licensing" and to require the CHA "to establish effective policies, procedures, and programs with respect to the training, supervision, and discipline of employees and/or agents of the CHA designed to remedy the conduct complained of herein." (*Id.* ¶ 71(b), (c)). He also seeks damages, including punitive damages, for the alleged constitutional violations and his breach of contract claim.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss should be granted if the plaintiff fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations in a complaint must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[P]laintiff must give enough details about the subject-matter of the case to present a story that holds together."). For purposes of a motion to dismiss, the court takes all facts alleged in the complaint as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

## III. ANALYSIS

### A. Section 1983 Claims (Counts I & II)

#### 1. *Monell* Liability

Section 1983 provides a cause of action against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Citing the First and Fourteenth Amendments, Schlessinger contends that the defendants retaliated against him for complaints he made about the operations of the CHA and CVR.

As the court explained in its June 3, 2013, order, because it is a municipal entity, the CHA can be held liable under § 1983 only if the alleged constitutional violation—First Amendment retaliation—resulted from the execution of one of its policies. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). This may be established by alleging: (1) an express policy that caused the constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled that it constitutes a policy; or (3) that the constitutional injury was caused by a person with final policy-making authority. *Lewis v. City of Chi.*, 496 F.3d 645, 656 (7th Cir. 2007).

The court previously held that Schlessinger's allegations were insufficient to plead either the first or second type of *Monell* claim (an express policy or widespread practice) because his complaint consisted largely of boilerplate allegations of a "long-standing policy, practice, and custom." (Mem. Op. & Order June 3, 2013, at 10.) The problem with the complaint was not just that the language was boilerplate, although the Seventh Circuit has counseled courts to disregard "legal conclusions" when evaluating a *Monell* claim. *McCauley v. City of Chi.*, 671 F.3d 611, 618 (7th Cir. 2011) (applying *Iqbal* and disregarding conclusory statements in a *Monell* claim). Rather, the complaint included such a "hodge-podge of allegations" (Mem. Op. & Order June 3, 2013, at 9) that it did not give the CHA notice of what the claim against it actually was, and the facts actually alleged did not suggest that the "failure to train" or "widespread policy" claims Schlessinger asserted were plausible—Schlessinger simply alleged highly specific injuries *he* had allegedly suffered and attempted to cast those alleged wrongful acts as a "policy."

The court concluded, however, that Schlessinger might be able to plead the third type of *Monell* claim by alleging facts showing that the individual defendants took actions that could be considered final policymaking decisions made on behalf of the CHA. Thus, Schlessinger was

9

allowed to replead his allegations that the allegedly retaliatory actions taken against him were committed by people who exercised final policymaking authority for the CHA. As the court stated previously, "[l]iability under § 1983 only attaches where 'a deliberate choice to follow a course of action is made . . . by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" (Mem. Op. & Order June 3, 2013 at 11 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

Unfortunately, Schlessinger's Second Amended Complaint is largely identical to his previous complaint, including the same repetitive boilerplate about longstanding customs and practices. Such language is not only boilerplate, it is irrelevant to the issue of whether the retaliatory acts were committed by a policymaker. The court disregards this language, along with the boilerplate assertions that the CHA failed to train and discipline its officials and the purely conclusory allegations that the individual defendants were "policymakers" who made "policy." *See McCauley*, 671 F.3d at 618. The court also disregards the following allegation as to Porter: "As a result of her representations to the Plaintiff in 2009 and 2011, and by her acts in retaliating against the Plaintiff shortly after the August 16, 2011 telephone conference call, Defendant Porter was vested with final policymaking authority." (*Id.* ¶ 51.) This paragraph is insufficient to plead a *Monell* claim because it simply makes no sense. It is not clear how Porter's "representations to the Plaintiff" and "acts in retaliating against the Plaintiff" could "vest[] her with final policymaking authority." She had to be vested with that authority by the CHA.

Although Schlessinger's attempt to replead his complaint has done little to clarify the jumble of allegations in his earlier complaint, he does include some specific factual allegations that, along with the general assertion that the individual defendants were "policymakers," might

10

support a *Monell* claim. Weeding through the complaint, the court has found the following facts that are relevant to the actions taken and the authority possessed by the individual defendants:

- Defendant Jessica Porter is Senior Vice President of the HCV Program for the CHA. She is responsible for ensuring that the CHA, its employees and other agents, comply with federal, state and local laws and regulations.

- Defendant Ken Love is Deputy Director of Inspections for the CHA. He is responsible for ensuring that the CHA, its employees and other agents, comply with federal, state and local laws and regulations.

- In May 2009, the CHA Board of Commissioners delegated to Defendant Porter authority to oversee and resolve issues complained about by the Plaintiff at the public Board meetings.

- Porter approached him after the 2009 Board meeting and told him that she would be his point of contact going forward to address the issues.

- In early 2011, Porter gave Schlessinger Love's telephone number and advised him that Love was responsible for overseeing the entire Inspections department of the CHA, and that Schlessinger should contact Love to resolve any issues with inspections that the supervisors or managers could not resolve.

- On August 10, 2011, Schlessinger had a telephone conference with Porter and Love, during which he discussed his complaints. Porter indicated that she would investigate his complaints. That same day, the CHA reclassified an inspection of one of his units to a "fail." Schlessinger contacted Love about the inspection on August 15, 2011.

- On August 16, 2011, Schlessinger had a telephone conference that included Porter and Love, in which he complained about issues he had previously raised and stated that he felt that the CHA was retaliating against him because of his complaints. Porter informed Schlessinger that the CHA would reinspect his failed unit.

- Shortly after the August 16, 2011 conference telephone call, Porter and Love conspired to retaliate against the Plaintiff for exercising his First Amendment rights when he spoke out about public waste and abuse.

- After inspectors failed fifty items in the unit during a reinspection on August 17, 2011, Love told Schlessinger that the inspection was a "special inspection," which Schlessinger contends was impermissible. Schlessinger asked Love for a copy of the failed items but did not receive a report until August 29, 2011.

11

- On August 31, 2011, Schlessinger received a letter from Porter stating that she had determined that there were concerns as to whether he was meeting his obligations under the HCV program and the HAP contracts. She threatened to abate his rent payments and terminate his HAP contracts and deny his future participation in the HCV program.

- On September 1, 2011, Schlessinger's HAP payment for August 2011 was deficient by $7,800.00. Schlessinger contacted Love to inquire as to why his payment was deficient. He received an email from Love stating that one of his HAP contracts had been terminated by the CHA and that the CHA was deducting funds paid to him since April 2011.

Construing the facts and drawing all inferences in Schlessinger's favor for purposes of the motion to dismiss, this list of allegations is sufficient to support the inference that Porter and Love exercised final policymaking authority for the CHA with respect to the participation of landlords in the HCV program and the way in which CHA inspections were handled. The issue before the court at this stage in the proceedings is not whether Porter and Love actually were final policymakers for the CHA, but only whether Schlessinger has sufficiently alleged that they had such authority to allow him to proceed with his claim.[1]

Porter and Love's respective positions as Senior Vice President of the HCV Program and Deputy Director of Inspections plausibly suggest that they could exercise policymaking authority for the CHA with respect to the actions in question: the cancellation of Schlessinger's HAP contracts and the allegedly improper inspection of his units. Furthermore, Schlessinger contends that it was Porter who informed him on August 16, 2011, that one of his units would be reinspected, and it was also Porter who told him on August 31, 2011, that "she had determined" he might be failing to meet his obligations under the HCV program and who threatened to

---

[1] Ultimately, to determine whether Porter and Love were policymakers, the court will have to consider whether their decisions were constrained by policies of other officials, subject to review (by, for example, the Board), and within the scope of their delegated authority. *See Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 676 (7th Cir. 2009).

terminate him from the program. As to Love, he was Schlessinger's point of contact regarding inspections, and he informed Schlessinger on September 1, 2011, that one of his HAP contracts had been terminated.

These allegations, as well as the timing of Schlessinger's complaints to the individual defendants and the alleged retaliation that occurred shortly thereafter, support an inference that Porter and Love were involved in the retaliatory actions allegedly taken against Schlessinger, and that they had the ability to influence the criteria used to determine when HAP contracts would be terminated and which housing units would pass inspections. The court concludes that these allegations suffice to allow Schlessinger to proceed with his *Monell* claim against the CHA.[2]

2. Injunctive Relief

Along with his claims for damages, Schlessinger requests certain injunctive relief. Schlessinger asks the court to:

> Permanently enjoin Defendants from inspecting HCV properties without the proper certification and/or licensing or from contractors doing business with Defendants from performing inspections without proper certification and/or licensing under federal, state or local laws and regulation

and to

> Enjoin and require Defendant CHA to establish effective policies, procedures and programs with respect to the training, supervision and discipline of employees and/or agents of the CHA designed to remedy the conduct complained of herein[.]

(Second Am. Compl. ¶ 71(b), (c).) The defendants argue that Schlessinger is not entitled to injunctive relief, and that Count I of the complaint should be dismissed to the extent that he seeks such relief. Schlessinger has not responded to this argument.

---

[2] This claim must proceed under the third prong of *Monell*. Discovery on the *Monell* claim should be limited to evidence relevant to whether the alleged retaliatory actions were committed by someone with final policymaking authority. In other words, broad discovery intended to uncover "customs and practices" of retaliation against people who complained about CHA inspections is not warranted in this case.

13

The court agrees that Schlessinger's claim for injunctive relief is inadequate. His requests for injunctive relief are not related to his First Amendment retaliation claim or his breach of contract claim and would not remedy the harm resulting from those alleged violations. Instead, he asks the CHA to make general changes to its practices of inspecting HCV properties and training and supervising its employees. As explained above, Schlessinger's *Monell* claim is not premised on the CHA's failure to train or supervise its employees. The motion to dismiss the claim for injunctive relief is granted, and the court strikes the above requests for relief.

**B. Breach of Contract (Count III)**

The defendants ask the court to dismiss Schlessinger's claim against the individual defendants for breach of contract in Count III. Schlessinger has not responded to this argument. Although the claim in Count III of the Second Amended Complaint purports to be against all of the defendants, the court previously dismissed the breach of contract claim against all of the individual defendants, including Porter and Love, with prejudice because they were not parties to the HAP contracts between Schlessinger and the CHA. (Mem. Op. & Order June 3, 2013, at 15.) For that same reason, Count III of the Second Amended Complaint cannot proceed against the individual defendants remaining in the case and is therefore dismissed as to Porter and Love.

**IV. CONCLUSION**

The defendants' motion to dismiss the Second Amended Complaint is granted in part and denied in part. The court dismisses Count III against Porter and Love and strikes Schlessinger's requests for injunctive relief in ¶ 71(b) and (c) of the complaint. The motion to dismiss the claims against the CHA is denied. Schlessinger may proceed on his First Amendment claim against all of the defendants, as well as on his breach of contract claim against the CHA. His First Amendment claim against the CHA, however, shall proceed only insofar as Schlessinger

can establish that the alleged retaliatory acts against him were committed by persons who exercised final policymaking authority for the CHA with respect to the acts in question.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: October 2, 2013