UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID SCHLESSINGER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Judge Joan B. Gottschall |
| v. ) | |
| ) | Case No. 12 C 3733 |
| THE CHICAGO HOUSING AUTHORITY, ) | |
| JESSICA PORTER (in her individual ) | |
| capacity), and KEN LOVE (in his ) | |
| individual capacity), ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff David Schlessinger ("Plaintiff" or "Schlessinger") alleges that defendants Chicago Housing Authority ("CHA") and CHA's former Senior Vice President of the Housing Choice Voucher Program, Jessica Porter, violated his First and Fourteenth Amendment rights by retaliating against him for opposing their improper conduct.[1] Now before the court is the defendants' motion for summary judgment. For the reasons explained below, the motion is granted.

**I.   NORTHERN DISTRICT OF ILLINOIS LOCAL RULE 56.1**

Before addressing the merits of the defendants' motion, the court turns to the defendants' objection to Schlessinger's Statement of Additional Facts ("SAF"). Under Local Rule 56.1(a)(3), a party moving for summary judgment must submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc*., 559 F.3d 625, 632 (7th Cir. 2009)

---

[1] In his opposition brief, Schlessinger voluntarily withdrew his claim against Ken Love, the former Director of Inspections for CVR Associates, Inc., a subcontractor of CHA.

(citing L.R. 56.1(a)(3). Local Rule 56.1(b)(3) then requires the nonmoving party to submit a "concise response" to each statement of fact, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs," with citations to the record, that require the denial of summary judgment. *See* L.R. 56.1(b)(3)(C); *see also Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

If the nonmoving party offers a separate statement of additional facts, the statement is limited to forty paragraphs, unless the nonmoving party obtains prior leave from the court. Here, the defendants object to Schlessinger's Statement of Additional Facts because it contains 109 separate paragraphs, and Schlessinger did not seek leave from the court to file the excess paragraphs. L.R. 56.1 imposes the 40-paragraph cap to force parties to introduce only material facts. As the Committee Comment to L.R. 56.1 explains, "[t]he judges of this Court have observed that parties frequently include in their L.R. 56.1 statements facts that are unnecessary to the motion and/or are disputed," and "that in the vast majority of cases, a limit of . . . 40 assertions of additional statements of fact will be more than sufficient to determine whether the case is appropriate for summary judgment." The Committee Comment adds that a nonmoving party may obtain a "relaxation" of the 40-statement limit by showing that the "complexity of the case" necessitates additional paragraphs. In this case, Schlessinger made no such showing. As a consequence, the court strikes paragraphs numbered 41 through 109 and considers the information presented in them only for context.

Additionally, Schlessinger violated Local Rule 56.1 and the law of this district in other respects. First, Schlessinger's response to the defendants' statement of material facts improperly

denies many of the defendants' numbered paragraphs. Local Rule 56.1(b)(3) requires the party opposing a motion for summary judgment to submit "a response to each numbered paragraph in the moving party's statement. . . ." L.R. 56.1(b)(3)(A)-(B). Although Schlessinger submitted a statement with numbered paragraphs corresponding to the defendants' paragraphs, none of Schlessinger's paragraphs contain "responses" that clarify the facts in dispute. Instead, where Schlessinger disputes a statement, he merely writes, "Disputed," and cites to paragraphs from his Statement of Additional Facts, not the record itself.

While this approach may have saved Schlessinger's counsel time, it merely shifted that expenditure of time onto the court. Schlessinger disputes twelve of the defendants' eighty statements of fact. For each paragraph in dispute, the court had to review the paragraphs Schlessinger cited from his Statement of Additional Facts, analyze the cross-referenced record citations, and ascertain whether those record citations were not only responsive to the numbered paragraph in the defendants' Statement of Fact, but raised a genuine dispute.

More often than not, Schlessinger cited to paragraphs from his Statement of Additional Facts that had nothing to do with the paragraph he was addressing in the defendants' Statement of Facts. Consequently, the court deems all paragraphs in the defendants' Statement of Facts admitted insofar as the record supports them and Schlessinger's denials are unresponsive. *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006) ("district courts are entitled to expect strict compliance with Local Rule 56.1"); *Flores v. Giuliano*, No. 12-cv-162, 2014 WL 3360504, at *2 (N.D. Ill. July 9, 2014).

Furthermore, Schlessinger's legal memorandum lacked sufficient citations to the parties' Local Rule 56.1 statements. "Courts in this district [ ] repeatedly have held that, in memoranda of law filed in support of, or in opposition to, motions for summary judgment, parties should cite

to the specific Local Rule 56.1 statements of fact in support of their arguments, not to the record directly." *Abdel-Ghaffar v. Ill. Tool Works, Inc.*, No. 12-cv-5812, 2015 U.S. Dist. LEXIS 111940, at *16-17 (N.D. Ill. Aug. 24, 2015) (citing cases). Here, however, Schlessinger cited to *neither* the parties' L.R. 56.1 statements nor the record in his recitation of the facts.

As a result, Schlessinger's recitation of the facts was relatively useless. Although it apprised the court of what Schlessinger believes is the relevant timeline, it placed the onus of constructing that timeline on the court. *See Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (L.R. 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary.") (citation omitted).

## II. FACTS

### A. Schlessinger

Schlessinger is a landlord who participated in the Housing Choice Voucher ("HCV") program, the federal government's Section 8 program that provides assistance to renters in the private market. Under the HCV program, once a program participant has located an approved rental unit, a local public housing agency, such as CHA, pays the landlord a rent subsidy. Schlessinger entered the HCV program in 2005, when CHA signed a Housing Assistance Payment ("HAP") Contract with him, so that he could lease one of his units to a program participant. Pursuant to that contract, CHA paid a portion of the monthly rent on behalf of the tenant directly to Schlessinger. Schlessinger has since executed several HAP Contracts with HAC on properties he owns.

4

### B. The CHA Housing Inspection Process

One of the requirements a landlord must satisfy to participate in the HCV program is the successful completion of a housing inspection on the proposed rental unit. HUD mandates that all properties pass an inspection before the HAP Contract is signed and at least once annually during the term of the contract. *See* Defs.' Ex. 7. The standards for an inspection are HUD's "Housing Quality Standards" ("HQS"), which refer to the "combination of both HUD and [CHA's] established requirements." *Id.* at 8-1. CHA inspectors, comprised of employees and independent contractors, are trained to inspect properties to determine whether they meet the HQS.

If a property fails an HQS inspection, CHA notifies the tenant and the owner of the violation and advises whether the deficiency is the responsibility of the tenant or owner. The responsible party has twenty-four hours to repair emergency or life-threatening violations and thirty days to repair other violations. The property is then re-inspected. If the repairs are not made within the respective time allotted, CHA provides the responsible party with a notice of intent to terminate his or her Housing Assistance Program benefits. If an owner's benefits are terminated, the owner's rent subsidies are discontinued and abated effective the last day of the month that the violation was first identified.

### C. Schlessinger's 2009 Complaints

Schlessinger began complaining to CHA about its inspections conducted at his properties in 2009. His complaints are reflected in the handouts he distributed during a CHA Board of Commissioners meeting in May 2009. *See* Defs.' Ex. 10. Included in those handouts were emails that Schlessinger sent regarding re-inspections that two of his properties had to undergo after failing prior inspections. He also included a copy of an email that he sent on May 14, 2009,

to a representative of CHA and one of its inspection contractors, McCright & Associates ("McCright"). The email was titled, "Department of Housing and Urban Developement [sic] Complaint," and it described at length Schlessinger's views that CHA inspectors:

> 1) were incompetent; 2) were negligent; 3) were improperly trained; 4) did not follow the proper inspection guidelines; 5) cited him for deficiencies that were the responsibility of the tenant; 6) cited him for violations that did not exist; 7) did not appear for inspection at the scheduled time; 8) improperly abated his properties; and 9) failed him for items that [he] had previously been told passed.

Defs.' SOF ¶ 15 (undisputed). At the end of the email, Schlessinger wrote:

> Also, please be advised that I will be attending the meeting of the CHA Council, on May 19, 2009, to bring these matters to their attention. I truly regret that this situation has escalated as such, however; I feel you and your organization have left me with no other choice and it is of my belief, that if I do not take action immediately, I will continue to be subjected to this unnecessary and wasteful inconvenience and monetary losses.

Defs.' Ex. 10.

Also included in the handout was a letter Schlessinger sent to Steve Meiss, a HUD official, on May 15, 2009. The letter reflects a phone conversation that Schlessinger had with Meiss the previous day regarding Schlessinger's complaints against CHA and McCright. Schlessinger wrote that

> [i]t [was] his belief that they have been ignoring their obligations and responsibilities to HUD and the community to properly train and monitor their inspectors, and to provide adequate and sufficient managerial support to correct the issues in a timely manner, when the inspectors do not do their job in a competent manner.

Defs.' Ex. 10. Schlessinger proceeded to describe over thirty instances in which inspectors had erroneously assessed violations against his properties. Although he "fe[lt] that" his letter contained "enough evidence to prove his [ ] allegations," he offered to provide "additional inspection reports" of his properties. *Id.* Schlessinger continued, "As you can calculate from the above foot notes, these inspectors [sic] incompetence has cost me thousands of additional dollars

6

per month in improperly determined responsibility of fail items." *Id.* He concluded by thanking Meiss for taking "the entire matter, carefully, into consideration." *Id.*

Schlessinger does not dispute that "[t]he overwhelming majority of [his 2009] written complaint concerned [his] properties." *See* Pl.'s Resp. to Defs.' SOF ¶ 18.

### D. Schlessinger's 2011 Complaints (March to July)

Sometime between "the months of March through June 2011," Second Am. Compl. ¶ 13, Schlessinger allegedly attended another CHA Board of Commissioners meeting to criticize CHA for its handling of property inspections. Although Schlessinger cannot recall when or where the meeting took place, or precisely what he said, he remembers airing "[t]he same complaints that [he made] in 2009." Schlessinger Dep. 67:6-10. He also recalls complaining about CHA's "customer service," "internal communications between departments," and waste of public funds. *Id.* 67:9-13.

On July 27, 2011, Schlessinger called Zill Khan, Assistant to the Director of Public Housing for HUD. Schlessinger testified that he was attempting to "contact[] the highest" ranking official at HUD who would hear his complaints against CHA. *Id.* 80:19-81:3. That same day, Schlessinger put his oral complaint to Khan in writing and sent a fax to HUD. The fax contained results for an inspection at one of Schlessinger's properties that Schlessinger believed exemplified "CHA's incompetence." *Id.* 77:21-25.

Shortly thereafter, Schlessinger sent an email to Porter titled, "URGENT MATTER PLEASE ADVISE."[2] *See* Pl.'s Ex. 12. The first sentence informed Porter that "[t]he following SEVEN PAGE disorganized, erratic, and inaccurate inspection results for one of [Schlessinger's]

---

2    Schlessinger carbon copied Meiss on the email.

7

properties were just faxed to Mr. Steven Meiss, Director of Public Housing, HUD." *Id.*

Schlessinger further wrote:

> As you may recall, the last time I filed a complaint with HUD, prior to our meeting, I had advised you that Mr. Meiss had instructed me to let him know at any time in the future, if CHA continued to complete inspections incompetently or inaccurately. I am continuing to have the exact same problem that I was encountering prior to meeting you.
>
> THREE inspections in the past 90 days have been inconsistent, inaccurate, incompetent, has [sic] identified incorrect or non existent [sic] fail items, and inaccurately put the responsibility of several fail items on the landlord that should be the responsibility of the tenant. . . . I cannot, nor should I be expected to, continue to have to contact Mr. Love on EACH AND EVERY INSPECTION that is being done on my properties. I do not have the time nor the patience, to continue to deal with such incompetence. . . .
>
> Could you please advise me the date, time, and location of the next Board Meeting? It looks like I will have to start going to the meetings again because we are right back to the point where I first met you when you assured me that you would make sure that these type of inspections would not happen again! I will not be able to continue to be patient and loose [sic] time and money due to the incompetent inspectors that CHA has hired since Mccright has no longer been doing the inspections.
>
> Your immediate attention to this matter of great importance is greatly appreciated.

*Id.*

Porter responded to Schlessinger's email by apologizing for not speaking to him when he tried calling her earlier that day. She also informed him that she would review his complaints and contact him the following day.

### E. Reclassification of 107 W. 110th St.

On August 10, 2011, CHA sent Schlessinger a Notice of Intent to Terminate Christine Pearson, an HCV Program participant and resident of 107 W. 110th St., one of Schlessinger's properties. Previously, Schlessinger had received an Inspections Results Notice, dated April 22, 2011, confirming that this same property had passed CHA's initial inspection for Pearson's

tenancy.  Schlessinger alleges that the reclassification of the passed inspection to a fail was retaliation for the disclosures he had made to Porter and Love on August 10, 2010.  *See* Second Am. Compl. ¶¶ 16-17.

It is now undisputed that CHA's contractor, CVR, erroneously sent pass notices to approximately 1000 unit owners, including Schlessinger, whose properties had failed inspections.  Michael Tonovitz, Senior Vice President of CVR, and Myisha Boulware, a CVR employee, testified that CVR was responsible for sending pass/fail notices to landlords.  When the error was detected, CVR took corrective action, including notifying the owners of the affected units that they had failed their inspections.

### F.  Schlessinger's August 16, 2011 Email

On August 16, 2011, Schlessinger sent an email to Porter titled, "URGENT MATTER FOR IMMEDIATE HUD REVIEW."  *See* Pl.'s Ex. 17.  He began the email by writing:

> I would like to recall your attention to our phone conversation of last week whereby you, Mr. Love, and I, [sic] had discussed several, severe, and specific problems that were causing major and unnecessary monetary losses to both myself and HUD fiduciary funds . . . . and the incompetent, inaccurate, and disorganized inspections that are continuously being conducted on most every [sic] past and recent inspection that I have encountered since CHA took back control of the inspections process [sic] January 1, 2011.

*Id.*  Schlessinger continued, "In that conversation I had provided you with specific inspections and even emailed you proof of this incompetence by providing you with inspection reports. . . ."  *Id.*  Schlessinger indicated that he "would appreciate [Porter's] confirmation of these inaccuracies and mistakes on the part of the CHA, and an immediate response as to each individual complaint containing a time frame as to when [he] might expect closure on these matters."  *Id.*

9

Included in the list of specific "matters" Schlessinger presented to Porter was the reclassification of the inspection results for 107 W. 110th St. Schlessinger contended that the property had passed an inspection in April 2011 and was inexplicably reclassified as a fail in August 2011. He then asked, "Is my rent going to be abated erroneously and unjustified because of this? This happens ALL THE TIME!!!!" *Id.*

Later that same day, August 16, 2011, Schlessinger participated in a teleconference with Porter, Love, Ana Vargas, the CEO of CVR, and Keith Coleman, Inspections Manager at CVR. Porter chaired the teleconference and initiated the call. During the teleconference, Schlessinger explained that he had received a notice mistakenly reclassifying the April 2011 inspection of 107 W. 110th St. to a fail. Schlessinger then asserted that the reclassification of the inspection was unfair and in retaliation for the complaints he had made to CHA and HUD.

Either before or after this teleconference, but sometime on August 16, 2011, Schlessinger also sent a fax to Meiss at HUD.[3] The cover page of the fax stated:

> Dear Mr. Meiss: Per my conversation with your assistant, Zill Khan, he requested I put my complaint against CHA in writing [and] fax it to you. Please review and call me at 773-339-XXXX. It is extremely important these issues get resolved as soon as possible. I have not been getting anywhere working with CHA directly. Please advise.

*See* Pl.'s Ex. 18.

### G. The Re-inspection of 107 W. 110th St.

On August 17, 2011, Coleman re-inspected Schlessinger's property, 107 W. 110th St. Schlessinger was present for most, but not all, of the re-inspection. CHA generated Inspection Results Notices addressed to Schlessinger on August 19, 2011 and August 22, 2011. Although it

---

[3] Schlessinger submitted only the cover page of the fax into the summary judgment record. *See* Ex. 18. The exhibit does not include the twenty-six pages that allegedly accompanied the fax or the confirmation page showing that the fax was actually transmitted.

is unclear whether Schlessinger received a copy of the August 19, 2011 notice, he acknowledges that CHA served the August 22, 2011 notice on him on August 22, 2011. The notice apprised Schlessinger that the property failed the re-inspection. The notice also warned him that the violations identified in the "inspection report" qualified as "24-Hour Life Threatening Conditions," as opposed to "Non-Life Threatening Conditions," and thus needed to be corrected within twenty-four hours. The notice clarified that CHA would re-inspect the property within forty-eight hours, and that Schlessinger's failure to comply within that time frame would result in the abatement of his Housing Assistance Payment and the termination of his HAP Contract.[4]

After receiving the August 22, 2011 notice, Schlessinger contacted Porter to request a copy of the HQS Inspection Report, which he claimed the notice did not include.

### H. Porter's August 26, 2011 Letter to Schlessinger

On August 26, 2011, Porter sent Schlessinger a letter summarizing the results of CHA's investigation into his complaints and the allegations he had been making. *See* Pl.'s Ex. 27. Porter wrote:

---

[4] Section 8-14 of CHA's Administrative Plan for the HCV Program articulates CHA's "HAP Abatement" policy:

> If an owner fails to correct HQS deficiencies by the time specified by [the Public Housing Agency ("PHA")], HUD requires the PHA to abate housing assistance payments no later than the first of the month following the specified correction period (including any approved extension). . . . The CHA will make all HAP abatements effective the first of the month following the expiration of the CHA specified correction period (including any extension). The CHA will inspect abated units within 7 calendar days of the owner's notification that the work has been completed. This inspection will not take place if the HAP Contract has been terminated. Payment will resume effective on the day the unit passes inspection.

See Defs.' Ex. 7 at 8-14.

> Dear Mr. Schlessinger:
>
> In response to your recent correspondence and our lengthy phone conversation on August 16, 2011, CHA has investigated your allegations that CHA is not properly administering its Inspections Department and reviewed the examples you provided to support your claim. As part of this dialog, you demanded this matter be given our immediate attention and CHA has honored this request.
>
> CHA's investigation revealed part of the problem is your pattern of routinely cancelling scheduled inspections the day before or the day of the re-inspection. Often, instead of following the Administrative Plan and Inspection Guidelines that requires [sic] contact to the Inspections Call Center, which handles inspection scheduling, you circumvented the process by calling to [sic] supervisory staff to submit last minute cancellation requests. Your circumvention of the proper protocol has, on many occasions, rendered CHA unable to remove these inspections from inspector routes in a timely manner, resulting in unnecessary trips to properties. As you are aware, when the tenant is not present for scheduled inspections, the issuance of termination notices occurs. It is emotionally detrimental to tenants to receive such notices, especially when the tenant was not actually at fault. Your pattern of cancellations presumably indicates a lack of taking prompt action to make required repairs to units on a regular basis.

*Id.*

Porter then addressed Schlessinger's "specific complaints," including his complaint related to CHA's reclassification of the inspection results for 107 W. 110th St:

> This unit failed inspection on February 28, 2011, based on a list of cited deficiencies. Due to an administrative error, CHA inadvertently issued a letter on April 18, 2011, erroneously, stating the unit passed the inspection. The error was subsequently corrected to indicate the unit was in a failed condition based upon the deficiencies still present on April 18. Your assertion is the April 18th letter passing the unit was correct because the required repairs were completed by April 18, 2011.
>
> After stating you would supply written certification that the repairs were completed as of April 18, 2011, your self-certification was received on August 17, 2011. Per our conversation, CHA agreed to send Mr. Keith Coleman to the unit on August 17 to perform another re-inspection regarding whether the cited deficiencies were corrected. Mr. Coleman found the unit in a deplorable condition with damages far beyond normal wear and tear, including 9 of the 14 previously cited deficiencies still present.
>
> Additionally, 51 other HQS violations were readily observed [sic] which the CHA obtained extensive documentation including photographs and videos to show the

condition of the unit. As you are aware, the CHA has an obligation to cite any
new deficiencies observed during a re-inspection.

These deficiencies, many in plain sight and visible to the naked eye, include but
are not limited to:

- Electrical Hazards
- Plumbing Problems
- Deteriorated Paint that must be corrected using Lead Safe Work Practices
- Tenant Caused Damages including emergency items and insect infestation
- Structural Damage that may be the result of long term plumbing leaks
- Overall unsanitary conditions

During this inspection, you informed Mr. Coleman that you did not intend to
make the necessary repairs. During our conversation, you stated you are currently
dealing with the City Building Department regarding this unit. Based upon your
statements, we are obligated to follow up with the City because notification of
Code Violations at a unit requires the immediate abatement of assistance . . . .

Mr. Coleman's inspection of the unit revealed a series of readily evident and
egregious violations of HQS, including concerns of an emergency nature, lead
based paint hazards, and other deplorable conditions and the presence of
unauthorized tenants, including small children who could be seriously harmed by
these violations. The physical evidence in the properties which you claim meets
HQS contradicts your representations of being an exemplary owner and manager.
These deficiencies indicate a disregard to meeting your obligations, pursuant to
the HAP Contract for this unit, to maintain it in accordance with Housing Quality
Standards. Therefore this matter is being turned over to our Legal Department for
further review.

*Id*.

Schlessinger does not dispute that he was cited for over 50 HQS violations twice in the four months preceding the August 17, 2011 re-inspection. *See* Defs.' SOF ¶ 27 (undisputed). Nor does Schlessinger dispute that his properties have been cited for multiple HQS violations virtually since he began participating in the HCV Program. *Id.* ¶ 42 (undisputed); *see also* Defs.' Exhibit 19 (showing previous inspection results for Schlessinger's properties, including 43 owner violations on 10/3/2006, 30 owner violations on 12/4/2007, 45 owner violations on 3/20/2009, 34 owner violations on 10/5/2010, 59 owner violations on 4/12/2011, and 64 owner

13

violations on 7/18/2011). Schlessinger agrees that some of the violations Coleman found on August 17, 2011 were present. *Id.* ¶ 28.

## III. LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## IV. ANALYSIS

The sole claim remaining in Schlessinger's complaint against the defendants is for retaliation in violation of his rights under the First and Fourteenth Amendments pursuant to 28 U.S.C. § 1983. To prevail on this claim, Schlessinger "must prove that (1) he engaged in constitutionally protected speech; (2) the defendants, as public officials, engaged in adverse conduct against him; and (3) the defendants were motivated, at least in part, by his protected speech." *Bivens v. Trent*, 591 F.3d 555, 559 (7th Cir. 2010). Defendants move for summary judgment, in part, on the ground that Schlessinger did not engage in constitutionally protected speech.[5]

---

[5] The defendants also contend that they are entitled to summary judgment because (1) there is no causal connection between Schlessinger's speech and the retaliatory acts he alleges; (2) no evidence exists that any person with final policy-making authority took a retaliatory action; and

To determine whether speech is constitutionally protected, "[c]ourts apply the two-step analysis established in *Connick v. Myers,* 461 U.S. 138 (1983). . . ." *See Chicago United Indus., Ltd. v. City of Chicago*, 685 F. Supp. 2d 791, 812 (N.D. Ill. 2010) aff'd, 669 F.3d 847 (7th Cir. 2012) (citing *Brooks v. University of Wisconsin Bd. of Regents,* 406 F.3d 476, 479 (7th Cir.2005)). The first step is an inquiry into "whether the plaintiff engaged in speech that addressed a matter of public concern." *Chicago United Indus.*, 685 F. Supp. 2d at 812. "If this hurdle is cleared," the court then "must balance 'the employee's interest in commenting upon such matters and the employer's interest in efficient public services.'" *Gazarkiewicz v. Town of Kingsford Heights, Indiana*, 359 F.3d 933, 940 (7th Cir. 2004) (quoting *Wainscott v. Henry,* 315 F.3d 844, 848 (7th Cir.2003)).

The defendants contend that Schlessinger cannot pass the first step in the *Connick* inquiry because he spoke purely on matters of personal concern. Speech is considered "a matter of public concern if it relates to any matter of political, social, or other concern to the community." *Id.* at 849 (internal quotation and citation omitted). *Gazarkiewicz*, 359 F.3d at 940-41. "Conversely, speech is not a matter of public concern if it involves a personal grievance of interest only to the [speaker]." *Id.* "Whether a statement is a matter of public concern is a question of law . . . and [courts] answer this question by examining the content, form, and context" of the statement. *Bivens*, 591 F.3d at 560 (quotation marks omitted). Of these factors, "content is the most important. . . ." *Gazarkiewicz*, 359 F.3d at 941.

Here, Schlessinger asserts that he engaged in constitutionally protected speech when he: (1) appeared at a CHA Board of Commissioners' meeting "[i]n between the months of March

---

(3) Porter was not individually involved in the alleged retaliatory acts. It is unnecessary for the court to consider these issues because the court concludes that Schlessinger's speech was not protected by the First Amendment.

through June 2011," Second Am. Compl. ¶13, to complain about CHA's "improper use of federal funding . . . that cost taxpayers, HCV landlords and participants unnecessary monetary loss"; and (2) emailed Porter on August 16, 2011 to criticize "the unlawful pass/fail notices and the unwarranted abatements assessed against him." *See* Pl.'s Opp. at 9. Schlessinger contends that the First Amendment shields these statements because he was protesting government waste, which courts have recognized constitutes a topic of public concern. *See, e.g., Wainscott v. Henry*, 315 F.3d 844, 849 (7th Cir. 2003).

In cases such as this, however, where "a personal grievance" concerns a subject of public interest, "it is necessary to look at the point of the speech in question: was it the [speaker's] point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Bivens*, 591 F.3d at 561 (quotation marks and citation omitted). In *Bivens*, the Seventh Circuit affirmed the district court's grant of summary judgment in favor of the defendants on the plaintiff's First Amendment retaliation claim. *Id.* at 557. The plaintiff, an officer in the Illinois State Police, complained to his superiors and filed a grievance after he discovered that he had elevated levels of lead in his blood; the plaintiff worked in an indoor firing range and was exposed to lead contamination in the facility. *Id.* Following the denial of his request for workers' compensation benefits, he sued his superiors under Section 1983, alleging that they retaliated against him for complaining about the conditions at the firing range. *Id.*

The controlling issue, as the Seventh Circuit stated, was "whether the context, form, and particular content (as opposed to the subject matter) of the speech indicate that [the plaintiff] complained for the purely private purpose of resolving a workplace issue." *Id.* at 561. Though "the context of the [plaintiff's] grievance" touched on "a subject of potential interest to the

16

public," that fact did not "convince [the court] that his purpose was anything other than personal." *Id.* Like a teacher complaining about class size and discipline "in response to criticism of her performance," *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis, Ind.*, 42 F.3d 403, 411 (7th Cir. 1994), or a police detective complaining about "pervasive violations of an anti-smoking ordinance" to alleviate the "difficulties the speaker himself had experienced," *Smith v. Fruin*, 28 F.3d 646, 652 (7th Cir. 1994), the plaintiff in *Bivens* filed his grievance "for the sole purposes of securing his own medical treatment and ensuring he had a safe working environment." *Bivens*, 591 F.3d at 562. Thus, "even if the public would have been interested in lead contamination at the range, or would have benefitted from the remediation that [the plaintiff] requested," the Seventh Circuit found that the plaintiff's internal grievance was not protected by the First Amendment because it "address[ed] only the effect of lead contamination on himself and his work environment. . . ." *Id.*

Similar to the police officer in *Bivens*, the teacher in *Cliff*, and the detective in *Smith*, Schlessinger has failed to show that he engaged in constitutionally protected speech. First, regarding the manner of his speech, Schlessinger submits two sets of statements: (1) the oral statements he allegedly made before the CHA Board of Commissioners "[i]n between the months of March through June 2011," Second Am. Compl. ¶ 13, and (2) his August 16, 2011 email to Porter. With regard to the former, Schlessinger testified that when he spoke at the CHA Board of Commissioners meeting, he made the made "[t]he same complaints that [he] complained about in 2009" and criticized CHA for its "customer service," "internal communications between departments," "misuse of funds," and "incompetence." *See* Schlessinger Dep. 67:6-23. But these "complaints" are merely general subject matters. They do not apprise the court of what Schlessinger actually said.

17

For his part, Schlessinger cannot recall any specific statements he made at the 2011 meeting. *See Id*. In fact, he has admitted that he cannot remember the month, much less the date, of the meeting, even though the meeting allegedly took place approximately a year before he filed suit. *See* Defs.' SOF ¶ 19 (undisputed). Nor does Schlessinger recall where the meeting was held, the weather conditions at the time, the process for applying to speak, how many people spoke, or other observations consistent with having actually attended the meeting. *Id*. The most concrete information Schlessinger provides to shed light on his alleged oral statements is that they echoed the complaints he made in his August 16, 2011 letter to Porter. While that letter was contemporaneous to the 2011 meeting, it is a distinct communication that the court must analyze separately. *See Cygan v. Wisconsin Dep't of Corr.*, 388 F.3d 1092, 1099 (7th Cir. 2004) (Courts "analyze each instance of speech separately to determine its protected status.") (citing *Wright v. Ill. Dept. of Children & Family Servs.,* 40 F.3d 1492, 1499 (7th Cir.1994)).

"At the summary judgment stage of a proceeding, a plaintiff must 'put up or shut up' and show what evidence [he] has that would convince a trier of fact to accept [his] version of events." *Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014) (quoting *Steen v. Myers,* 486 F.3d 1017, 1022 (7th Cir.2007)). Here, Schlessinger's inability to show that he said anything at all gives the court no confidence that he could "convince a trier of fact to accept [his] version of events." *Steen,* 486 F.3d at 1022; *see also Olendzki*, 765 F.3d at 749 ("Without Olendzki's identification of his precise statements [at the union meeting], the court has no way to know what he actually said. While it is possible that his statements warrant protection, it is also possible that his speech simply addressed his job duties, were general grievances, raised only his own private interests, or were fighting words—none of which are entitled to First Amendment protection."); *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir. 2009) ("Nagle does not identify

any specific statements that were made at the meeting. While his statements regarding police manpower could, as a general matter, be of public concern, the subject matter alone does not convey constitutional protection to his statements.").

By contrast, the second expression Schlessinger offers as a basis for his claim—his August 16, 2011 email to Porter—is at least part of the record and contains specific statements the court can evaluate. However, the form of this speech does not help Schlessinger's case. Like the *Bivens* plaintiff's grievance, Schlessinger's email "was entirely internal" between himself and CHA's representatives, Porter and Love. *Bivens*, 591 F.3d at 561. "Although the fact that [Schlessinger's email] was entirely internal does not itself render the speech unprotected, this fact does suggest that the [speech] was personal in nature." *Id.* (citation omitted).

Likewise, the context and content of Schlessinger's August 16, 2011 email are also "consistent with [his] vindication of a personal interest, rather than a public concern. . . ."[6] *Bivens*, 591 F.3d at 561. A week before sending the email, Schlessinger participated in a teleconference with Porter and Love, in which he discussed "specific problems that were causing major and unnecessary monetary losses to both [him]self and HUD fiduciary funds . . . ." Pl.'s Ex. 17.

Schlessinger's August 16, 2011 email was a follow-up on this call. He asked Porter to "confirm[]" CHA's "inaccuracies and mistakes" and respond to his "individual complaint[s]." He also requested that Porter respond in a "time frame [that he] might expect closure" on the "matters" he raised—the matters being the five properties that Schlessinger identified by tenant, address, and property-specific issue he wanted resolved. For example, one of the properties was 107 W. 110th St., and Schlessinger challenged the reclassification of the inspection on that unit

---

[6] Of course, it is impossible to analyze the context of the oral statements Schlessinger allegedly made at a CHA Board meeting, as he cannot recall the month it was held.

19

to a fail. Schlessinger then rhetorically asked, ""Is my rent going to be abated erroneously and unjustified because of this?" and exclaimed, "This happens ALL THE TIME!!!!" *Id.*

Every aspect of Schlessinger's August 16, 2011 email indicates that its purpose was to further his private interests. Schlessinger was not attempting "to bring an issue of wrongdoing . . . to public light." *Bivens*, 591 F.3d at 562. Nor was he trying to raise "a subject of potential interest to the public." *Id.* at 561. Instead, the point of Schlessinger's email was singular and self-serving: to resolve issues affecting his property and expected payments. Schlessinger sought more favorable inspection results, faster responsiveness to his personal complaints, and a guarantee that his payments would not be abated. Because Schlessinger's email concerned matters purely of personal interest, his email falls outside the purview of the First Amendment.[7]

Accordingly, the court grants the defendants' motion for summary judgment and dismisses Schlessinger's Second Amended Complaint.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 16, 2013

---

[7] Dismissing Schlessinger's First Amendment retaliation claim on this ground renders the court's striking of Schlessinger's statements of fact numbered 41 through 109 irrelevant. Schlessinger addressed his alleged attendance at the CHA Board of Commissioners meeting, as well as his August 16, 2011 email to Porter, within the first 40 paragraphs of his Statement of Additional Facts. Thus, even if the court had considered the entirety of his Statement of Additional Facts, the outcome would not have changed.